**CRUISECOMPETE, LLC, Plaintiff,**

v.

**SMOLINSKI & ASSOCIATES, INC. d/b/a Palm Coast Travel and Lee Smolinski, Defendants.**

**No. 4:11–cv–490.**

United States District Court, S.D. Iowa, Central Division.

May 9, 2012.

Todd M. Lantz, David Wayne Nelmark, Belin McCormick, P.C., Des Moines, IA, for Plaintiff.

E.J. Flynn, Bradley C. Obermeier, Duncan Green Brown & Langeness PC, Des Moines, IA, for Defendants.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is a "Motion to Dismiss, Stay, or Transfer to the U.S. District Court for the Southern District of Florida," filed January 10, 2012 by Smolinski & Associates Inc. d/b/a Palm Coast Travel

("S & A")[1] and Lee Smolinski ("Smolinski") (collectively "Defendants"). Clerk's No. 24. CruiseCompete, LLC ("Plaintiff") filed a resistance to the Motion on January 23, 2012. Clerk's No. 30. Defendants filed a Reply on January 31, 2012. Clerk's No. 35. Defendants filed a Supplemental Reply on February 7, 2012.[2] Clerk's No. 41. Plaintiff filed a Surreply on February 7, 2012.[3] Clerk's No. 42. The Court held a hearing on the pending motion on March 14, 2012. Clerk's No. 50. The matter is fully submitted.[4]

## I. FACTUAL BACKGROUND[5]

Plaintiff was founded on March 28, 2003 by Bob Levinstein ("Levinstein"), Eric Busick ("Busick"), and Heidi Allison–Shane ("Allison–Shane").[6] Am. Compl. ¶ 14. On September 15, 2003, Plaintiff launched a website called CruiseCompete.com, which was designed to allow consumers looking for a cruise to identify a cruise they are interested in and receive competing quotes from travel agents. Id. ¶ 16. The website is designed so that travel agencies cannot directly contact consumers; rather, consumers receive a travel agency's contact information along with its cruise quote, and the consumer can then contact the travel agency directly if she wishes to book a cruise pursuant to the quote offered. Id. ¶ 18–19. Consumers pay nothing to use the CruiseCompete.com website. Id. ¶ 21. Instead, Plaintiff's revenues are derived from advertising and from revenue shares from actual cruise bookings paid to Plaintiff's "member-agencies."

A travel agency wishing to offer quotes to consumers through CruiseCompete.com. must first become a "member-agency" by executing the CruiseCompete Membership Agreement ("Membership Agreement").[7] Id. ¶ 20. The Membership Agreement requires that for "every cruise or cabin sold as a result of any lead generated by Agency's use of the CruiseCompete system, Agency's [sic] will pay CruiseCompete a revenue share equal to two percent (2.0%) of the gross commissionable amount of the cruise regardless of discounts [offered] to customer."[8] Id. ¶ 23; id. Ex. 2 at 1. The

---

1. It appears from the record that S & A does business as Palm Coast Travel and as Smartcruiser.com. Because these three entities appear to be the same single legal entity operating under various aliases, the Court will refer to them interchangeably throughout this order.

2. Defendants were granted leave to file the Supplemental Reply on February 2, 2012. Clerk's No. 37. The Clerk of Court, however, did not detach and separately file the Supplemental Reply in compliance with the Court's Order until February 7, 2012.

3. Plaintiff was granted leave to file the Surreply on February 3, 2012. Clerk's No. 38. The Clerk of Court, however, did not detach and separately file the Surreply in compliance with the Court's Order until February 7, 2012.

4. On February 7, 2012, Defendants filed a "Motion for Leave to file Additional Supplement to Reply." Clerk's No. 40. Plaintiff filed a resistance to that motion on February 9, 2012. Clerk's No. 43. Defendants request for leave to file an additional supplement is denied for reasons discussed *infra* in this Order.

5. The factual background is taken from the Amended Complaint. Where relevant, the Court will identify and discuss disputes over the allegations of the Amended Complaint in the Analysis section of this Order.

6. Levinstein and Busick are Iowa residents and Allison–Shane is a Michigan resident. Am. Compl. ¶ 14.

7. Travel agencies can join Plaintiff's service for free, so long as they offer a minimum number of quotes in response to consumer requests in their first 90 days of membership. Am. Compl. ¶ 24.

8. Travel agents selling cruises receive commissions from the cruise lines for bookings. Am. Compl. ¶ 22.

Membership Agreement further requires a prospective member-agency to certify that it has read and agrees to be bound by certain "Terms and Conditions" posted as of the date of the Agreement.[9] *Id.* Ex. 2 at 1. These Terms and Conditions require member-agencies to honestly self-report all cruise bookings facilitated by Cruise-Compete.com through the member-agency's account so that revenue sharing can be properly calculated. *Id.* ¶ 33. Consumers also have an option of reporting a booking with a particular travel agency. *Id.* ¶ 37. If a consumer reports a booking that has not been reported by the travel agency, the booking appears in the travel agency's account as a "user-reported booking." *Id.* The travel agency can then confirm or dispute the booking. *Id.* Cruise-Compete.com scores member-agencies on the accuracy of their self-reporting and reserves the right to suspend member-agents' accounts or increase revenue shares owed to Plaintiff in the event that bookings are significantly underreported. *Id.* at 40. In particular, the Terms and Conditions provide that, "[i]f CruiseCompete discovers a booking has been made by Agency, and this booking was not reported to CruiseCompete by Agency by the sail date of the cruise, then Agency agrees that the Revenue Share payable to CruiseCompete shall be fifteen percent (15%) of the Gross Commissionable Amount for that cruise." *Id.* Ex. 3 at 3.

To submit a quote request, a consumer using the CruiseCompete.com website must affirmatively agree that she is "not a cruise travel agent or cruise travel industry employee or doing research on their

behalf" and that she "will not forward quotes [she] receive[s] to other travel agents." *Id.* ¶ 26. The CruiseCompete.com website, however, also provides a mechanism whereby travel industry personnel can submit quote requests. To submit such a quote request, "cruise travel agents and cruise travel industry employees" must check a box agreeing that, "[b]y submitting a request to this system you give your legal consent to all *terms and conditions* for cruise travel industry personnel to use this service for research purposes." *Id.* ¶ 27. The phrase "terms and conditions" is hyperlinked to the terms and conditions governing "research requests," i.e., quote requests submitted by travel industry personnel, and provides that for each such research request, the "person or organization which controls the e-mail account through which the request was submitted shall be separately and jointly liable to pay $10,000 per quote request submitted." *Id.* ¶ 30.

According to the Amended Complaint, Smolinski contacted Plaintiff via email on November 6, 2003 and requested information on becoming a member-agency of CruiseCompete.com. *Id.* ¶ 41. Levinstein called Smolinski from Iowa to discuss the matter, and on April 7, 2004, Smolinski's travel agency, S & A, operating under the alias SmartCruiser.com ("SmartCruiser"), joined CruiseCompete.com by faxing the Membership Agreement to Levinstein in Iowa via fax. *Id.* ¶¶ 3, 43–44. On April 30, 2008, Plaintiff and SmartCruiser entered into an Agency Membership Renewal Agreement ("AMRA"), containing the

---

**9.** Regarding modifications to the Terms and Conditions, the Membership Agreement provides:

> CruiseCompete may make reasonable changes to the Terms and Conditions at its discretion, and will make reasonable efforts to inform Agency about these changes including sending e-mails to the e-mail ad-

dresses supplied by Agency via Agency's Account and via prominent postings on the "Welcome" page of Agency's account. Agency has thirty (30) days to decline to accept these changes or they will be deemed accepted by Agency and incorporated into this Agreement.

Am. Compl. Ex. 2 at 1.

same relevant terms as the original Membership Agreement, which was also transmitted by Smolinski to Levinstein in Iowa via fax. *Id.* ¶¶ 45–46. Smolinski personally signed the AMRA, listing his title as CEO of SmartCruiser. *Id.* ¶ 48.

During SmartCruiser's first four years as a CruiseCompete.com member-agency, its use of the system was only "occasional." *Id.* ¶ 53. SmartCruiser's booking volume picked up significantly, however, in approximately March 2008. *Id.* During the time it was a member of CruiseCompete.com, SmartCruiser gave 177,272 quotes to consumers, reported 2,369 bookings, and reported gross commissionable cruise revenue of $4,675,607.70, with the majority of this activity occurring between March 2008 and December 2009. *Id.* ¶ 54–55. From approximately May 2008 to December 2009, however, Plaintiff repeatedly provided email notices to SmartCruiser that it was in breach of its reporting obligations. *Id.* ¶ 55. While SmartCruiser would occasionally make efforts to improve its reporting accuracy, it eventually stopped responding to Plaintiff's demands to cure the breach and stopped using the CruiseCompete.com website to offer quotes to consumers. *Id.* Plaintiff contends that from March to May 2009, SmartCruiser failed to report eighteen bookings, even after being sent notice and an opportunity to cure, and that Smart-Cruiser thus owes Plaintiff 15% of the gross commissionable revenue from those bookings, pursuant to the penalty Terms and Conditions of the AMRA. *Id.*

In addition to SmartCruiser's alleged breach of the terms of the AMRA, Plaintiff asserts that Smolinski additionally abused its quote system by creating at least three false CruiseCompete.com user accounts, each of which was designed to conceal Smolinski's identity as a travel industry professional from Plaintiff. *Id.* ¶ 60. Specifically, Plaintiff asserts that Smolinski used false email accounts to pose as a cruise consumer and request cruise quotes on nineteen separate occasions, subjecting Smolinski and SmartCruiser to joint liability of at least $190,000 ($10,000 per each of the nineteen quote requests) pursuant to the terms and conditions on the Cruise-Compete.com website governing "research requests." *Id.* ¶ 61–62. Plaintiff further claims that Defendants used information obtained from the fraudulent quote requests to report other CruiseCompete.com member-agencies to the cruise lines for violation of cruise line pricing policies. *Id.* ¶ 67.

Finally, Plaintiff contends that Defendants have improperly sued Plaintiff as counter-defendants in an action pending in Florida (the "Florida action"). *Id.* ¶ 68–71. In that action, SmartCruiser was sued by Revelex, Inc. in relation to a dispute over ownership of software that powers cruise websites. *Id.* ¶ 68. SmartCruiser named Plaintiff and certain CruiseCompete.com member-agencies as counter-defendants in the Florida lawsuit. *Id.* Plaintiff alleges that SmartCruiser's claims in the Florida lawsuit are frivolous, designed to harass Plaintiff, and in any event, violate the Terms and Conditions of SmartCruiser's AMRA with Plaintiff which provides that "[b]oth parties submit to the exclusive jurisdiction of the State and Federal Courts located in Polk County, Iowa for any action or proceeding relating to the Agreement brought by either party." *Id.; id.* Ex. 3 at 3. Based on the alleged actions of Defendants, Plaintiff filed an Amended Complaint on December 23, 2011 asserting the following causes of action against Defendants: 1) breach of the AMRA; 2) breach of research request terms and conditions; 3) Computer Fraud and Abuse Act; 4) fraudulent misrepresentation; 5) tortious interference with prospective and business relationships; and 6) unjust enrichment.

## II. LAW AND ANALYSIS

### A. *Personal Jurisdiction*

According to Defendants, Smolinski is a twenty-seven year resident of Florida who has never lived in Iowa, traveled to Iowa, engaged in business in Iowa, or advertised, solicited, or transacted business in Iowa. Defs.' Br. at 8–9. Defendants contend that Smolinski's first contact with Iowa was when Allison–Shane called him in Florida to ask if S & A would like to become a member-agency of Plaintiff. *Id.* at 9. Ultimately, Smolinski, acting only in his capacity as CEO of S & A (d/b/a Smartcruiser.com), signed the Membership Agreement, and later the AMRA, with Plaintiff on behalf of S & A. Defendants further contend that S & A is a Florida corporation that has never owned or rented an office, real estate, or a bank account in Iowa, has never had representatives, agents, or employees in Iowa, and has never solicited customers or transacted business in Iowa. *Id.* According to Defendants, all aspects of Smartcruiser's performance under the terms of the AMRA were to occur, and did in fact occur, in Florida. *Id.* According to Defendants, their contacts with Iowa were so minimal that the Court must dismiss the case against them for lack of personal jurisdiction.

#### 1. *Legal Standards.*

■ To determine whether it has personal jurisdiction over a non-resident defendant, this Court is guided by two primary rules. First, the facts presented must satisfy the requirements of the state's long-arm statute. *See Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 225 (8th Cir.1987). If the activities of the non-resident defendant pass the first level of analysis, the Court must then consider whether the exercise of personal jurisdiction complies with the requirements of constitutional due process. *See*

*Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir.1995); *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1388 (8th Cir.1991). "Because personal jurisdiction in Iowa reaches to the fullest extent permitted by the Constitution," however, this Court "need only examine whether minimum contacts sufficient to satisfy the Fourteenth Amendment exist." *Hicklin Eng., Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir.1992) (per curiam) (citing *Newton Mfg. Co. v. Biogenetics, Ltd.*, 461 N.W.2d 472, 474 (Iowa 1990)); *see also Republic Credit Corp. I v. Rance*, 172 F.Supp.2d 1178, 1182 (S.D.Iowa 2001) ("[B]ecause personal jurisdiction in Iowa is coterminous with the constitutional reach of due process, the two level inquiry collapses into one.").

■ "While it is true that the plaintiff bears the ultimate burden of proof on [the issue of personal jurisdiction], jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." *Dakota Indus., Inc.*, 946 F.2d at 1387 (citing *CutCo Indus. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986)). Thus, to survive the present motion to dismiss for lack of personal jurisdiction, Plaintiff need only make a prima facie showing of personal jurisdiction over Defendants. *See, e.g., Northrup King Co.*, 51 F.3d at 1387; *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 818 (8th Cir.1994); *Watlow Elec. Mfg. Co. v. Patch Rubber Co.*, 838 F.2d 999, 1000 (8th Cir. 1988). In evaluating whether Plaintiff has made such a showing, the Court must view the evidence in the light most favorable to Plaintiff and resolve all factual conflicts in Plaintiff's favor. *See Dakota Indus., Inc.*, 946 F.2d at 1387 ("If the district court does not hold a hearing and instead relies on pleadings and affidavits, as it did here,

the court must look at the facts in the light most favorable to the nonmoving party.").

■■■ Due process mandates that personal jurisdiction exists only if a defendant has sufficient "minimum contacts" with the forum state, such that summoning the defendant to the forum state would not offend " 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). To maintain personal jurisdiction, a defendant's contacts with the forum state must be more than "random," "fortuitous," or "attenuated." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Rather, sufficient contacts exist when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In evaluating a defendant's reasonable anticipation, there must be " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Jurisdiction is proper, therefore, where the contacts proximately result from actions by the defendant that create a "substantial connection" with the forum state. *Id.; World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559.

■■■ In addition to the basic principles of due process, the Court ordinarily evaluates five factors in analyzing the constitutional requirements needed to sustain personal jurisdiction: 1) the nature and quality of the contacts with the forum state; 2) the quantity of contacts with the forum; 3) the relation of the cause of action to these contacts; 4) the interest of the forum state in providing a forum for its residents; and 5) the convenience of the parties. *See Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1432 (8th Cir.1995) (citing *Northrup*, 51 F.3d at 1388; *Land–O–Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir.1983)). The first three factors are considered to be primary, with the third factor distinguishing whether jurisdiction is specific or general.[10] *See Wessels*, 65 F.3d at 1432 n. 4. The latter two factors are considered "secondary factors." *Minn. Mining & Mfg. Co. v. Nippon Carbide Indus. Co.*, 63 F.3d 694, 697 (8th Cir.1995); *Northrup King*, 51 F.3d at 1388.

2. *Analysis.*

a. *S & A.*

■■■ Plaintiff asserts that personal jurisdiction over S & A is proper because the AMRA between the parties expressly incorporated the Terms and Conditions for Agency Membership, which contains the following choice of law and forum selection clause:

> The Service and the web-site are operated in the State of Iowa. The Agreement shall be governed by and interpreted

---

**10.** It has been said that when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum, the State is exercising "specific jurisdiction' over the defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (citation omitted). "When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant." *Id.* at n. 9, 104 S.Ct. 1868 (citations omitted).

according to the laws of the State of Iowa, without regard to its conflict of laws provisions. Both parties submit to the exclusive jurisdiction of the State and Federal Courts located in Polk County, Iowa for any action or proceeding related to the Agreement brought by either party, and each party expressly waives any objection it may have to such jurisdiction or the convenience of such forum.

Pl.'s Resistance Br. at 5–6; Am. Compl. Exs. 2–3. Moreover, Plaintiff argues that S & A, using the name Palm Coast Travel, is registered to do business in Iowa as a travel agency, thereby subjecting it to both general and specific jurisdiction in Iowa courts. Pl.'s Resistance Br. at 6. Additionally, SmartCruiser is alleged to have provided 617 separate cruise price quotes to CruiseCompete consumers who indicated they resided in Iowa, resulting in Smart-Cruiser reporting bookings with Iowa residents totaling $15,801.74 in gross commissionable revenue. *Id.*

In a situation where there is a valid forum selection clause, the ordinary personal jurisdiction analysis is supplanted since it is well established that "parties to a contract may agree in advance to submit to the jurisdiction of a given court." *Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 316, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964). Indeed, the Supreme Court has recognized that a mandatory forum-selection clause is prima facie valid and "should control absent a strong showing that it should be set aside." *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 591, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *see also M.B. Rests., Inc. v. CKE Rests., Inc.,* 183 F.3d 750, 752 (8th Cir.

1999) ("Forum selection clauses are prima facie valid and are enforced unless they are unjust or unreasonable or invalid for reasons such as fraud or overreaching."). It is clear that the forum selection clause at issue in this case is mandatory, given its provision that "[b]oth parties submit to the *exclusive* jurisdiction of the State and Federal Courts located in Polk County, Iowa." Am. Compl. Ex. 3 (emphasis added); *see Dunne v. Libbra,* 330 F.3d 1062, 1064 (8th Cir.2003) (explaining that mandatory forum selection clauses employ terms such as "shall," "exclusive," "only," or "must").

Defendants do not contend that the forum selection clause in this case is unjust or unreasonable. Indeed, Defendants do not even mention the forum selection clause in either their Motion or in their Reply brief, despite the fact that the Amended Complaint explicitly references the forum selection clause in its jurisdictional allegations.[11] *See* Am. Compl. ¶ 12. Rather, Defendants address the existence of the forum selection clause for the very first time in their Supplemental Reply brief. *See* Clerk's No. 41. In that document, Defendants contend that there is no forum selection clause at play in this case because the AMRA "neither contained a forum selection clause nor incorporated a forum selection clause." Defs.' Supp. Reply at 2. Specifically, Defendants argue that, although the language in the AMRA states that both parties "agree to be bound by the ... Terms And Conditions for Agency Membership posted as of the date of this Agreement," there were "no links to Terms and Conditions posted on the Plaintiff's website" on April 30, 2008, the date the parties signed the AMRA. *Id.*

Defendants' arguments fails for two reasons. First, Defendants' Supple-

11. Plaintiff also placed the forum selection clause squarely at issue in its Resistance brief. Pl.'s Resistance Br. at 5–6. In their Reply, however, Defendants only acknowledge the existence of a "choice of law provision." *See* Defs.' Reply at 5.

mental Reply brief violates Local Rule 7(g), which provides that parties may file reply briefs to "assert newly-decided authority or to respond to *new and unanticipated arguments* made in the resistance." (emphasis added). There is no question that the forum selection clause was neither a "new" argument made in Plaintiff's Resistance nor an argument that was reasonably unanticipated by Defendants, given the fact that the forum selection clause was clearly identified as a basis for jurisdiction in the Amended Complaint. Since "[i]t is well established that issues not argued in an opening brief cannot be raised for the first time in a reply brief," it is beyond dispute that it is wholly improper for Defendants to attempt to raise the invalidity of the forum selection clause for the first time in reply brief—let alone in a supplemental reply brief. *Republican Party of Minn. v. Kelly*, 247 F.3d 854, 881 (8th Cir.2001).

Second, even if Defendants had properly raised the validity of the forum selection clause as an issue in the present motion, they have failed to demonstrate that the forum selection clause was not part of the AMRA. In support of the claim that there were no Terms and Conditions posted as part of the AMRA, Defendants attempt to employ an Internet archival service known as the "Wayback Machine"[12] to argue that "the archived images of the Plaintiff's website that are available to the public, as the site appeared on April 23, 2008 and May 13, 2008, reveal that there was no forum selection clause 'posted' on the plaintiff's website on the date the parties signed the AMRA." *Id.* In response to Defendants' argument, Plaintiff filed a Surreply providing its own documentation using the Wayback Machine and pointing out that when the correct URL is entered in the archival service, it is clear that the Terms and Conditions "were posted *at least* as early as April 12, 2008" and "remained posted, in identical fashion—still featuring the forum selection clause—on May 14, 2008, the next date the webpage was archived." Pl.'s Surreply at 6.

As stated in *supra* note 4, after Plaintiff filed its Surreply brief, Defendants sought leave to file an Additional Supplemental Reply brief. In the proposed Additional Supplemental Reply (Clerk's No. 40–1), Defendants first argue that Plaintiff's Wayback Machine documentation is "unauthenticated," despite the fact that Plaintiff employed precisely the same type of authentication for its use of the Wayback Machine as Defendants did in their Supplemental Reply brief. Thus, to the extent that Plaintiff's Wayback Machine documentation is improperly authenticated and thus inadmissible, so too is the Wayback Machine documentation attached to Defendants' Supplemental Reply brief.[13] Defendants next argue that Plaintiff cannot prove that the Terms and Conditions were posted on its website *on April 30, 2008*, the date the parties entered the AMRA, because the Wayback Machine did not capture archival images of the CruiseCompete.com website on that date. Defs.' Add'l Supp. Reply Br. at 1. Pointing out that the burden is on Plaintiff to prove that personal jurisdiction is proper over the Defendants, Defendants then reach the strained conclusion that Plaintiff *cannot* prove that the Terms and Conditions were

---

**12.** The Court discusses the "Wayback Machine" in greater detail in *Sam's Riverside, Inc. v. Intercon Solutions, Inc.*, 790 F.Supp.2d 965 (S.D.Iowa 2011).

**13.** To the extent that Defendants provide "properly" authenticated documentation in its Additional Supplemental Reply, such documentation is in violation of Local Rule 7(g) because it is neither "newly decided authority" nor is it in "respon[se] to new and unanticipated arguments" made in Plaintiff's Surreply.

posted on the relevant date and thus, apparently, that Plaintiff will never be able to prove that Defendants are subject to personal jurisdiction.

■ Even were the Court to permit Defendants to file the Additional Supplemental Reply brief, it would reject Defendants' arguments. As the Court stated *supra*, to survive the present motion to dismiss for lack of personal jurisdiction, Plaintiff need only make a prima facie showing of personal jurisdiction over Defendants. *See, e.g., Northrup King Co.*, 51 F.3d at 1387; *Bell Paper Box, Inc.*, 22 F.3d at 818; *Watlow Elec. Mfg. Co.*, 838 F.2d at 1000. In evaluating whether Plaintiff has adequately sustained its burden in this regard, the Court must resolve all factual conflicts in Plaintiff's favor. *See Dakota Indus., Inc.*, 946 F.2d at 1387. Thus, to the extent that Plaintiff and Defendants dispute whether the Terms and Conditions were posted on Plaintiff's website on April 30, 2008, the Court must resolve the dispute in favor of Plaintiff, and in turn, in favor of finding that the forum selection clause supports personal jurisdiction over S & A.[14]

Moreover, Plaintiff correctly points out that Defendant's single-minded focus on whether the Terms and Conditions were posted on the publically available portions of the CruiseCompete.com website on April 30, 2008, ignores several important considerations, including: 1) that while the AMRA provided that the "Parties agree to be bound by the version of CruiseCompete's Terms and Conditions for Agency Membership posted as of the date of this Agreement," it also provided that the Agency "asserts that it has read and un-derstood all of CruiseCompete's Terms and Conditions for Agency Membership" and further states in bold print: "Terms and Conditions (Important! You must review all Terms and conditions Before Signing!" (Am. Compl. Ex. 2); 2) that Levinstein sent Smolinski an email on March 28, 2008 reminding him to review the Terms and Conditions that would appear in agency accounts (Levinstein Aff. (Clerk's No. 42–2) ¶ 3); 3) that the Terms and Conditions were posted on the "Agent Welcome" screen in the "log-in" portion of the CruiseCompete.com website on March 28, 2008 and continuously thereafter (*id.* ¶ 4); 4) that Levinstein sent Smolinski an e-mail on April 22, 2008 that contained the AMRA ultimately signed by Smolinski and that specifically stated, "please review the attached along with the Agency Terms & Conditions (which can be found via a link from the 'Welcome' page of your agency account" (*id.* ¶ 5). Indeed, in his affidavits filed in this case, Smolinski only states that the "Terms and Conditions proffered by CruiseCompete in this matter … were not *presented* to me or any Defendant in this matter, in any format, prior to the time the AMRA was signed in Florida on April 30, 2008." Smolinski Aff. (Clerk's No. 41–1) ¶ 6 (emphasis added). He notably does not deny or dispute that he actually saw the Terms and Conditions or that he read them prior to signing the AMRA on behalf of SmartCruiser.com.

When considering the pleadings and the affidavits filed in this case in the light most favorable to Plaintiff, the Court is satisfied that the forum selection clause is enforceable and that Plaintiff has, therefore, made a sufficient prima facie showing to demon-

---

14. The Court notes that its March 14, 2012 hearing was a generalized hearing on Defendants' Supplemental Motion to Dismiss, Stay or Transfer. It was *not* a "full-blown evidentiary hearing" on the issue of personal jurisdiction. Indeed, both parties presented only argument—not evidence—at the hearing. *See Dakota Indus., Inc.*, 946 F.2d at 1387 ("[J]urisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing.").

strate that personal jurisdiction over S & A is proper. *See St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 624 (8th Cir.2001) (stating that a party may consent to jurisdiction by signing a contract containing a forum selection clause); *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 726 (8th Cir.2001) (finding that due process concerns are satisfied where a defendant consents to personal jurisdiction by entering into a contract containing a valid forum selection clause).

b. *Smolinski.*

With respect to Smolinski, Plaintiff argues that he is subject to personal jurisdiction in Iowa because he "is not just a typical travel agent who happens to be working for SmartCruiser." *Id.* Rather, Smolinski is the President, CEO, and owner of SmartCruiser and signed the AMRA on SmartCruiser's behalf. *Id.* Thus, according to Plaintiff, Smolinski is " 'closely related' to the disputes arising out the agreement and properly bound by the fo-

rum selection clause provisions." [15] *Id.* at 6–7 (quoting *Marano Enters. of Kansas v. Z–Teca Restaurants, L.P.*, 254 F.3d 753, 757 (8th Cir.2001)).

In *Marano Enterprises,* the Eighth Circuit found that a forum selection clause in a contract between Marano Enterprises and Z–Teca Restaurants was enforceable against Leon Marano even though he was not personally a party to the agreement. *Marano Enters.*, 254 F.3d at 757. "As for Leon Marano, … he is a shareholder, officer, and director of Marano Enterprises, which *was* a party to the agreements. As such he is, without question, 'closely related' to the disputes arising out of the agreements and properly bound by the forum-selection provisions." *Id.* (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir.1993) ("In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound.")); *see also U.S. ex rel. Lighting and Power Servs., Inc. v. Interface Constr. Corp.*, No. 4:07–cv–1144,

**15.** Plaintiff additionally argues that personal jurisdiction over Smolinski is proper because it was Smolinski who initiated contact with Plaintiff, not the other way around. *Id.* at 7. Specifically, Plaintiff contends that on November 6, 2003, Smolinski sent an email to Plaintiff asking how to join the CruiseCompete.com service. *Id.* Additionally, Plaintiffs argue that: 1) Smolinski signed the Membership Agreement knowing that Plaintiff was headquartered in Iowa and "reached out to [Plaintiff] in Iowa to submit the documents"; 2) Smolinski transmitted the AMRA, which listed Plaintiff's Iowa address, to a fax machine located in Iowa using an Iowa area code; 3) the Terms and Conditions incorporated into the AMRA specifically state that Plaintiff's service and web site are operated in Iowa; 4) Plaintiff's Iowa owners regularly communicated with Smolinski via email and phone from Iowa; 5) Defendants' revenue reports were reviewed in Iowa by Plaintiff's Iowa owners; 6) certain revenue shares paid by SmartCruiser.com to Plaintiff were charged to a credit card in Smolinski's name;

7) Smolinski owns and operates numerous travel-related entities and communicated with Plaintiff using the entities' email addresses interchangeably; and 8) Smolinski made numerous calls to Plaintiff in Iowa. *Id.* at 8–9. Moreover, Plaintiff alleges that Smolinski personally submitted quote requests to the CruiseCompete.com website after checking a box affirming and agreeing that travel industry personnel using the site for research purposes would be liable both individually and jointly with their employing organization for such requests. *Id.* at 9–10. Finally, Plaintiff urges that Smolinski is subject to specific personal jurisdiction in Iowa because he "engaged in fraudulent conduct direct at an Iowa-based company, the effects of which were felt in Iowa." *Id.* at 10 (citing *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)). The Court need not address these arguments further at this point in time given its conclusion, *infra*, that Plaintiff has made an adequate prima facie showing that the forum selection clause is enforceable against both S & A and Smolinski.

2007 WL 2710030, at *6 (E.D.Mo. Sept. 11, 2007) ("A non-party will be bound to a forum selection clause where the non-party is so closely related to the dispute that it becomes foreseeable that it will be bound."); *Citimortgage, Inc. v. First Preference Mortgage Corp.*, No. 4:06–cv–01296, 2007 WL 2684272, at *6 (E.D.Mo. Sept. 7, 2007) (finding personal jurisdiction over an individual who executed agreements solely in his capacity as a corporation's president and chairman of the board of directors because he was "closely related to the disputes arising out of those agreements . . . and is properly bound by the forum selection clause [because] it is foreseeable that he would be bound by the forum selection clause"); *Texas Source Group, Inc. v. CCH, Inc.*, 967 F.Supp. 234, 237 (S.D.Tex.1997) (finding that a non-party to an agreement was nonetheless bound by a forum selection clause because the non-party's "relationship with the plaintiffs and the defendants is so inextricably intertwined that he should be subject to the forum-selection clause"); *Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.*, 949 F.Supp. 1427, 1434 (N.D.Cal.1997) (finding that the forum selection clause in a professional services agreement applied to two parties, a corporate plaintiff and an individual, who were not signatories to the agreement). In this case, Smolinski is the CEO, owner, and President of Smartcruiser and executed the AMRA on behalf of Smartcruiser. It should have been entirely foreseeable to Smolinski that he was sufficiently related to Smartcruiser's relationship with Plaintiff that he would be bound by the forum selection clause. Accordingly, the Court is satisfied that Plaintiff has made a sufficient prima facie showing to demonstrate that personal jurisdiction over Smolinski is proper.

## B. *Venue*

Defendants next assert that venue in this case is not proper in the Southern District of Iowa. Specifically, Defendants argue that Plaintiff has offered neither argument nor evidence to support a conclusion that "a substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of Iowa, pursuant to 28 U.S.C. § 1391(b). According to Defendants, "It is illogical to suggest that *any* of the alleged events or omissions purportedly giving rise to the six (6) Counts [of the Amended Complaint] 'occurred in Iowa' " because Defendants have never transacted business in Iowa, Plaintiff's Internet protocol address reveals that its computer servers are in Texas, and revenue shares under the AMRA are sent to Allison–Shane in Michigan. Defs.' Br. at 14–15. Defendants further emphasize that "[a]t least twelve (12) of Plaintiff's top member agencies are located within the State of Florida. None of Plaintiff's top agencies, many of which will be either witnesses or defendants in the Florida Lawsuit (and this matter if not dismissed) are located within Iowa or licensed to sell travel in Iowa." *Id.* at 15.

▮ The Court finds Defendants' arguments unconvincing. First, as discussed above, Defendants have not properly challenged the validity of the forum selection clause. Accordingly, that provision alone is sufficient to establish proper venue in this district because "a forum selection clause may be viewed as a waiver of a defendant's right to object to venue." *Dominium Austin Ptrs., L.L.C. v. Emerson*, 248 F.3d 720, 727 n. 5 (8th Cir.2001). Second, Defendants do not dispute Plaintiff's arguments that the AMRA "specifies that it is to be governed by Iowa law [and] spells out Defendants' obligations in interacting with a computer system administered from Iowa," that "[t]he bulk of the work related to the contract—the maintenance, operation, and oversight of the CruiseCompete website—occurred in Iowa," or that "the fraudulent actions of

Smolinski were directed at Iowa and designed to cause harm in Iowa." Pl.'s Resistance Br. at 14–15. Accordingly, the Court finds that Plaintiff has made a sufficient prima facie showing that venue is proper in the Southern District of Iowa. *See Mitrano v. Hawes,* 377 F.3d 402, 405 (4th Cir.2004) (finding prima facie showing of venue sufficient to survive motion to dismiss for improper venue where no evidentiary hearing is held).[16]

### C. Abstention Doctrine, First Filed Rule, Court's Inherent Power

Defendants argue that the Court should abstain from hearing this case because there is a parallel proceeding pending in Florida, exceptional circumstances warrant abstention, and because the Florida action has priority over the present case. Defs.' Br. at 17–18. Alternatively, Defendants argue that the Court should give priority to the Florida action under the first-filed rule, or use its inherent authority to dismiss the case so that "the issues presented, virtually all of which are or will become duplicative, can be resolved within the case already filed with the Circuit Court in and for Palm Beach County, Florida." *Id.* at 19–20.

■■■■ Defendants' arguments in this regard rely largely on their conclusory assertion that the present case is either collateral or parallel to the Florida action. The Florida action deals with allegations by Revelex that Defendants misappropriated Revelex's trade secrets in relation to a proprietary booking engine and tortiously interfered with its business relationships. *See* Defs.' Mot. Ex. G. In response to Revelex's suit, Defendants brought cross-claims [17] against a variety of entities, including Plaintiff, for misappropriation of trade secrets, violation of Florida Decep-

tive and Unfair Trade Practices Act, and tortious interference with existing and prospective business relationships. Upon review of the pleadings filed in the Florida action; however, it is clear that, save for a duplication of parties, the two cases have virtually nothing in common. While Defendants repeatedly argue that the "Florida lawsuit and the instant matter (if allowed to proceed) will involve the same claims and defenses based upon the same facts and circumstances" and will "require testimony from the same key witnesses and consideration of the same key evidence," they provide absolutely no explanation or evidence supporting this contention. Indeed, the Court cannot fathom how *any* of the evidence in the Florida action, dealing primarily with misappropriation of intellectual property and a contract *between Defendants and Revelex,* would even arguably tend to overlap with the evidence in the present action, dealing with terms of a specific contract *between Plaintiffs and Defendants* that is not at issue in the Florida action and that has no apparent connection to the intellectual property issues in that case.

■■■■ Moreover, even if there were similarities between the Florida action and the present one, abstention would be wholly inappropriate. The *Colorado River* abstention doctrine permits a federal court to divest itself of jurisdiction by abstaining only when parallel state and federal actions exist and where exceptional circumstances warrant abstention. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817–18, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). In the Eighth Circuit, actions are considered "parallel" only when there is a "substantial likelihood that the state court proceeding will fully

---

**16.** *See supra* note 13.

**17.** The cross-claims against Plaintiff are incorrectly labeled "counterclaims" in the Florida suit. *See* Defs.' Mot. Ex. A.

dispose of the claims presented in federal court." *Fru-Con Const. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 535 (8th Cir.2009). Although Defendants recognize the requisite standard for parallel proceedings, *see* Defs.' Br. at 17–18, they do not make any effort to explain how the Florida action will "fully dispose of" any of the claims in this action. Given that the AMRA between Plaintiff and Defendants plays absolutely no role whatsoever in the Florida litigation, it difficult to imagine what argument Defendants could make to sustain their burden in this regard. Moreover, Defendants' argument regarding the "exceptional circumstances" that would warrant abstention is wholly unconvincing. *See* Defs.' Br. at 18 (arguing without explanation or evidence that five of six applicable "exceptional circumstances" factors weigh in favor of abstention).

Defendants' citation to the first-filed rule is equally deficient. Intended to conserve judicial resources and avoid duplicative litigation, the "first-filed rule" generally grants district court judges the discretion to dismiss or stay an action when a previously-filed concurrent action is pending in another judicial district. *See Florida v. United States*, 285 F.2d 596, 604 (8th Cir.1960) ("Courts are not required by law to forbear but may do so as a matter of comity and to avoid duplicate litigation."); *Anheuser-Busch, Inc. v. Supreme Int'l Corp.*, 167 F.3d 417, 419 (8th Cir. 1999) (finding doctrine is subject to "abuse of discretion" review). Because the rule stems from the "doctrine of federal comity," *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121 (8th Cir. 1985), it is generally deemed to apply only in cases where two virtually identical cases are filed in two different *federal* judicial districts. *See Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877 (3d Cir.1981) (finding that the first-filed rule was "never meant to apply where the two courts involved are not courts of the

same sovereignty"); *Continental Cas. Co. v. AXA Global Risks (UK) Ltd.*, No. 4:09–cv–335, 2010 WL 1268038, at *4 (W.D.Mo. Apr. 2, 2010) ("District courts in this Circuit have routinely held that the 'first-filed' analysis does not apply to 'proceedings before two different sovereignties.'") (quoting *Leomporra v. Jet Linx Aviation, Inc.*, No. 09–770, 2009 WL 1514517, at *2 n. 2 (D.Minn. June 1, 2009)). Even if applicable in situations such as this one— where one action is pending in federal court and the other action is pending in state court—the Court would nonetheless decline to exercise its discretion to dismiss or transfer the case pursuant to the first-filed rule. Likewise, the Court declines to use its inherent authority to dismiss or otherwise stay the case pending resolution of the Florida action. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936) (recognizing that federal courts may stay proceedings pursuant to "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants").

### D. *Transfer*

Section 1404(a), designed as a "federal housekeeping measure, allowing easy change of venue within a unified federal system," provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); 28 U.S.C. § 1404(a). In determining whether to exercise its discretion to transfer an action pursuant to § 1404, the Court may consider a myriad of factors, including the convenience of parties and witnesses, access to sources of proof and evidence, the governing law, and the possibility of delay if a transfer is

granted. As well, the Court may consider practical factors, such as where the case can be tried more efficiently and expeditiously and whether any prejudice will result if a transfer is granted. *See Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688 (8th Cir.1997); *Terra Intern., Inc. v. Mississippi Chemical Corp.*, 922 F.Supp. 1334, 1334 (N.D.Iowa 1996); *Houk v. Kimberly–Clark Corp.*, 613 F.Supp. 923 (W.D.Mo.1985); *Stabler v. New York Times Co.*, 569 F.Supp. 1131 (S.D.Tex. 1983). The burden is upon the party seeking transfer to "make a clear showing that the balance of interests weighs in favor of the proposed transfer, and unless that balance is strongly in favor of the moving party, the plaintiff's choice of forum should not be disturbed." *Houk*, 613 F.Supp. at 927 (citations omitted); *see also Shutte v. Armco Steel Corp.*, 431 F.2d 22 (3d Cir. 1970) (plaintiff's forum choice is to be given "paramount consideration").

█ Defendants argue that Florida is a more convenient forum for litigating the present case because: 1) "virtually all of the key witnesses and evidence are located in Florida"); 2) "all the relevant conduct giving rise to Plaintiff's claims occurred in Florida"; 3) Defendants claims against Plaintiff in the Florida action and Plaintiff's breach of contract, tortious interference, and unjust enrichment claims will all "require consideration under Florida law"; and 4) Florida will be a less expensive and more convenient forum because "the material witnesses and evidence are located in Florida." Defs.' Br. at 22–23. Almost all of Defendants' assertions, however, rely on the unsupported and unfounded conclusion that the Florida action is somehow "substantially similar" to the present action—a conclusion that this Court has already considered and rejected. Moreover, even assuming that any of the witnesses in the Florida action would be "essential" in this case, Defendants have failed to "clearly specify the essential witnesses to be called

[and to] make a general statement of what their testimony will cover." *Nelson v. Master Lease Corp.*, 759 F.Supp. 1397, 1402 (D.Minn.1991) (citing Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3851 at 425); *see also Reid–Walen v. Hansen*, 933 F.2d 1390, 1396 (8th Cir.1991) ("The burden is on the defendant to provide these facts by way of affidavit or other information."). Likewise, Defendants have not identified any evidence that would be too voluminous to transport to Iowa or that would be unavailable were the action to proceed in this forum. *See Coker v. Bank of America*, 984 F.Supp. 757, 766 (S.D.N.Y.1997) (concluding that in the era of photocopying, fax machines, and Federal Express, the weight given to availability of documentary evidence factor is slight); *Met–L–Wood Corp. v. SWS Indus., Inc.*, 594 F.Supp. 706, 710 (N.D.Ill.1984) (finding location of books and records not an important factor unless documents so voluminous that transportation is a major undertaking). Finally, Defendants have failed to address the existence of both a forum selection clause *and* an Iowa choice of law provision in relation to their § 1404(a) analysis. *See Stewart Org., Inc. v. Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (finding that a forum selection clause constitutes a significant factor that figures centrally in deciding whether a transfer should be granted). Under these circumstances, the Court finds that Defendants have failed to make a clear showing that the balance of interests weighs in favor of the proposed transfer.

## III. CONCLUSION

For the reasons stated herein, Defendants' Motion for Leave to file Additional Supplement to Reply (Clerk's No. 40) and Defendants' Motion to Dismiss, Stay, or Transfer to the U.S. District Court for the

Southern District of Florida (Clerk's No. 24) are DENIED.

IT IS SO ORDERED.